Shannon PEREZ; Harold Dutton, Jr.; Gregory Tamez; Sergio Salinas; Carmen Rodriguez; Rudolfo Ortiz; Nancy Hall and Dorothy Debose, Plaintiffs

v.

State of TEXAS; Rick Perry, in his official capacity as Governor of the State of Texas; David Dewhurst, in his official capacity as Lieutenant Governor of the State of Texas; Joe Straus, in his official capacity as Speaker of the Texas House of Representatives; Hope Andrade, in her official capacity as Secretary of State of the State of Texas, Defendants.

Civil Action No. 11–CA–360–OLG–JES–XR.

United States District Court,
W.D. Texas,
San Antonio Division.

Feb. 28, 2012.

Order Denying Stay Sept. 7, 2012.

David R. Richards, Richards Rodriguez & Skeith, LLP, Richard Edwin Gray, III, Gray & Becker, P.C., Austin, TX, for Plaintiffs.

Matthew Hamilton Frederick, David Mattax, Bruce D. Cohen, Angela V. Colmenero, Ana M. Jordan, Assistant Texas Attorney General, David J. Schenck, Deputy Attorney General for Legal Counsel, Austin, TX, for Defendants.

## ORDER

ORLANDO L. GARCIA, District Judge.

Pending before the Court is the LULAC Plaintiff–Intervenor's Motion to Stay Implementation of Interim Congressional Redistricting Plan C235 (Dkt. # 716). After due consideration, the Court finds that the motion should be DENIED.

On February 28, 2012, the Court issued Plan C235 as the interim plan for the districts used to elect members to the United States House of Representatives in the current election cycle. (Dkt. # 681). On March 19, 2012, the Court issued an opinion explaining the plan. (Dkt. # 691). The Court also ordered that the 2012 elections proceed on an expedited schedule under the interim plan. (Dkt. # 689). None of the parties objected to the Court's rulings.

We are now on the eve of the general elections and LULAC seeks "to stay the implementation of interim plan C235," which would require the Court to disrupt the election process and draw a new congressional plan that would also be subject to appeal. The Court understands that LULAC's actions were prompted by the D.C. Court's very recent ruling on Section 5 challenges to the State's enacted plan, and the Court has carefully considered whether it can take any action prior to the 2012 general election. After hearing arguments of counsel and the testimony of Bexar County Election Administrator Jacquelyn Callanen, the Court has concluded that taking any action at this juncture is not feasible. The ballots are on their way to the printer and must be mailed very soon to comply with the MOVE Act. Early voting starts on October 22, 2012, just 45 days from today. Delaying the November election is simply not a viable option, and bifurcating the election would lead to voter confusion and enormous expense to the counties, without any assurance that deadlines for a second election could be met.

The Court did not have the benefit of any Section 5 determinations when Plan C235 was implemented in February. Those determinations by the D.C. Court were not forthcoming until last week, and the State is appealing same. In the meantime, the United States Supreme Court has "authorized District Courts to order or to permit elections to be held pursuant to apportionment plans that do not in all respects measure up to the legal requirements, even constitutional requirements." *Upham v. Seamon*, 456 U.S. 37, 44, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982).[1] "Necessity has been the motivating factor in these situations," *id.*, and that is the factor that drives the Court under the difficult circumstances faced herein.

The Court understands LULAC's current concerns, in light of the D.C. Court's ruling on August 28, 2012, but the motion to stay must be DENIED.[2]

It is so ORDERED.

### ORDER

The court adopts PLAN C235 as the interim plan for the districts used to elect representatives in 2012 to the United States House of Representatives. A map showing the redrawn districts in PLAN C235 is attached to this Order as Exhibit A.[1] The textual description in terms of census geography for PLAN C235 is attached as Exhibit B. The statistical data for PLAN C235 is attached as Exhibit C. This plan may be also viewed on the District Viewer website operated by the Texas Legislative Council (http://gis1.tlc.state.tx.us/) under the category "Court-ordered interim plans." Additional data on the Court's interim plan can be found at the following website maintained by the Texas Legislative Council under the "Announce-

1. *See also Reynolds v. Sims*, 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), wherein the Supreme Court explained:
   [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

2. Nothing in this order is to be construed as a preliminary or final ruling on any of the legal points urged by the plaintiffs or the State.

1. The court notes that PLANC235 is identical to PLANC226 except for the correction of technical errors identified by the Texas Legislative Council in six counties.

ments" banner: http://www.tlc.state.tx.us/ redist/redist.htm. The Court thanks the staff at the Texas Legislative Council for their assistance in preparing this map. An opinion will be issued at a later date.

This interim plan is not a final ruling on the merits of any claims asserted by the Plaintiffs in this case or any of the other cases consolidated with this case. Nor is it intended to be a ruling on the merits of any claim asserted in the case pending in the United States District Court for the District of Columbia. Rather, this interim plan is a result of preliminary determinations regarding the merits of the Section 2 and constitutional claims presented in this case, and application of the "not insubstantial" standard for the Section 5 claims, as required by the Supreme Court's decision in *Perry v. Perez.*

### ORDER

On February 28, 2012, this Court issued PLAN C235 as the interim plan for the districts used to elect members in 2012 from Texas to the United States House of Representatives. This interim map is not a final ruling on the merits of any claims asserted by the Plaintiffs in this case or any of the other cases consolidated with this case. Nor is it intended to be a ruling on the merits of any claim asserted in the case pending in the United States District Court for the District of Columbia. Rather, this interim map is a result of preliminary determinations regarding the merits of the § 2 and constitutional claims presented in this case, and application of the "not insubstantial" standard for the § 5 claims, as required by the Supreme Court's decision in *Perry v. Perez,* 565 U.S. ——, 132 S.Ct. 934, 181 L.Ed.2d 900 (2012) (per curiam).

Both the § 2 and Fourteenth Amendment claims presented in this case involve difficult and unsettled legal issues as well as numerous factual disputes. It is espe-

cially difficult to determine whether a claim has a likelihood of success when the law is unsettled, as many areas of § 2 law are. Further, both the trial of these complex issues and the Court's analysis have been necessarily expedited and curtailed, rendering such a standard even more difficult to apply. The Court has attempted to apply the standards set forth in *Perry v. Perez,* but emphasizes that it has been able to make only preliminary conclusions that may be revised upon full analysis.

The Court heard extensive testimony concerning the need to have the primaries as soon as possible, and the resulting need for the Court to produce an interim map with sufficient time to allow officials to implement the map. Some Plaintiffs and Intervenors presented a compromise plan—C226—that would allow the primaries to proceed on May 29 and not require split primaries (thus avoiding significant costs to the counties). Defendants indicated that they have no objection to the Court's issuing an order directing that plan C226 be used on an interim basis for the 2012 elections. The Court finds that adoption of the compromise plan, if consistent with the standards set forth in *Perry v. Perez,* would significantly benefit the voters, candidates, election administrators, counties, and political parties. Because the Court's independent analysis of the plan indicates that it complies with the standards set forth in *Perry v. Perez,* the Court accepts the compromise plan, modified for purely technical reasons as discussed in Part III.A, as the interim plan.

### I. Factual and Procedural Background

### A. Congressional Redistricting in Texas

The decennial census was conducted last year, pursuant to Article I, § 2 of the United States Constitution. The 2010 census data showed that the population of

Texas had increased from the 2000 population of 20,851,820 to 25,145,561, an increase of about 20.6%.[1] It is undisputed that minority population growth, especially in the Hispanic community, accounted for much of the population increase.[2] The population changes mean that the current congressional districts are malapportioned and in violation of the one-person, one-vote principle,[3] and the population increase entitles the State of Texas to four additional seats in the United States House of Representatives. Thus, the State of Texas undertook redistricting efforts to reapportion seats. *See* U.S. CONST. ART. I, § 2.

S.B. 4, the proposed congressional plan, was first made public on May 31, 2011. A hearing was held on June 3, 2011. S.B. 4 passed the Texas Senate on June 6, and passed the Texas House on June 15. S.B. 4 was reported to the Senate as amended on June 16, and reported enrolled on June 20. S.B. 4 was sent to Governor Rick Perry on June 24. Governor Perry signed the bill into law on July 18, 2011. The State's enacted plan drew one new minority opportunity district—Congressional District ("CD") 35—along the I—35 corridor between Travis County and Bexar County, but drew no other additional minority opportunity districts.[4]

### B. Proceedings in this Court

Numerous Plaintiffs and Intervenors filed suit in this Court, asserting constitutional and statutory challenges against the State's enacted map. Plaintiffs assert that the State failed to draw additional required minority opportunity districts in the Dallas–Fort Worth metroplex ("DFW"), the Houston area, and West/South Texas, despite the substantial minority population growth there and satisfaction of the requirements for drawing such districts under § 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973. Section 2 of the VRA requires the State to draw a minority opportunity district if the Plaintiffs demonstrate that the requirements of *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), are satisfied. *Gingles* requires Plaintiffs to demonstrate: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that the minority group is politically cohesive; (3) that the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate; and (4) if the first three requirements are shown, that, considering the totality of circumstances, the minority group has less opportunity than whites to participate in the political process and to elect representatives of its choice.

Plaintiffs allege that the State racially gerrymandered districts to avoid drawing new minority opportunity districts and to intentionally disadvantage minority voters. Plaintiffs further complain that the State intentionally weakened CD 23, a minority opportunity district, to protect a Republican incumbent who was not the minority candidate of choice, and that the new configuration of CD 27 and the South Texas

1. http://www.census.gov/prod/cen2010/briefs/c2010br–01.pdf

2. A comparison of 2000 and 2010 census data shows that the number of persons of Hispanic or Latino ethnicity increased by 2,791,255, accounting for 65% of the total population growth of 4,293,741.

3. *See Abrams v. Johnson,* 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (the constitutional guarantee of one person, one vote requires congressional districts to achieve population equality "as nearly as is practicable") (quoting *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)).

4. CD 34 appears to be a "new" minority opportunity district, but it is a replacement for CD 27, which is no longer a minority district.

area dilutes Hispanic voting strength throughout South, West, and Central Texas in violation of § 2 and the Fourteenth Amendment. In addition, the Rodriguez Plaintiffs complain that the enacted map intentionally dismantled a functioning "tri-ethnic coalition" district (CD 25) in Travis County in violation of the Fourteenth Amendment.

Plaintiffs further challenge and seek to enjoin implementation of the State's enacted plan under § 5 of the VRA because it has not received preclearance. It is undisputed that Texas, as a jurisdiction with a history of racial discrimination in voting, is subject to the preclearance requirements of § 5 of the VRA, as amended and codified at 42 U.S.C. § 1973c.[5] A legislatively enacted plan that has not received preclearance cannot be implemented.

## C. D.C. Court Preclearance Proceedings—Summary Judgment

The State chose to obtain the preclearance required by § 5 by filing a lawsuit on July 19, 2011, and that suit is currently pending before a three-judge court in the United States District Court for the District of Columbia (hereinafter "the D.C. Court").[6] In that lawsuit, the State of Texas, as Plaintiff, has asked the D.C. Court to declare that the enacted plan complies with § 5 and that it may be implemented.[7] Section 5 provides that any voting qualification, standard, practice, or procedure (which includes redistricting) "that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or [membership in a language minority group], to elect their preferred candidates of choice denies or abridges the right to vote...." *Id.* § 1973c(b). The statute further explains that the term "purpose" shall include "any discriminatory purpose," and that the purpose of subsection (b) "is to protect the ability of such citizens to elect their preferred candidates of choice." *Id.* § 1973c(c), (d).

The United States and several Intervenors (collectively "the Defendants" in the D.C. proceedings) filed answers challenging the congressional plan, asserting that it is retrogressive in effect and was enacted with a discriminatory purpose in violation of § 5.

The State moved for summary judgment on its preclearance request on September 14, 2011.[8] After receiving briefing and

---

5. As the Supreme Court observed in its recent opinion concerning prior redistricting efforts in Texas, "The District Court recognized 'the long history of discrimination against Latinos and Blacks in Texas,' and other courts have elaborated on this history with respect to electoral processes:

> 'Texas has a long, well-documented history of discrimination that has touched upon the rights of African–Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the State

as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.' "

*LULAC v. Perry*, 548 U.S. 399, 439–40, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006) (citations omitted).

6. *State of Texas v. United States of America & Eric Holder*, Civ. A. No. 1:11–CV–1303 (D.D.C.). Filings in the D.C. Court are noted as "D.C. docket no. ——."

7. D.C. docket no. 1 (Original Complaint) at ¶ 48.

8. D.C. docket no. 41 (Motion for Summary Judgment).

hearing oral argument, the D.C. Court denied the motion for summary judgment on November 8, 2011.[9] The D.C. Court issued a memorandum opinion on December 22, 2011 explaining its denial of summary judgment.[10] In the memorandum opinion, the D.C. Court did not make rulings with regard to specific aspects of the State's plan. Rather, it discussed the applicable standards under § 5, including that the State has the burden of proof to show that the planned change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or [membership in a language minority group.]" 42 U.S.C. § 1973c(a).

To determine whether a redistricting plan has the effect of diminishing the ability to elect minority-preferred candidates (*i.e.*, a retrogressive effect), a court compares the enacted plan with a benchmark plan, which in this case is the redistricting plan currently in effect (plan C100, referred to herein as the "benchmark plan"). The D.C. Court held that the proper comparison is the minority group's *ability to elect* under the benchmark and enacted plans. The D.C. Court rejected Texas's position that the standard for determining retrogressive effect should include an evaluation of voting population demographics alone. Rather, it concluded, the inquiry is a functional one that involves numerous factors. Under this functional analysis, questions remained concerning which districts could be considered ability districts.

Because Texas used the wrong standard, the D.C. Court concluded, there were material facts in dispute about which districts are minority ability districts, and the D.C. Court was unable to determine on the summary judgment record whether the enacted plan would have a retrogressive effect.

In addition to the claim of statewide retrogression, the retrogressive effects dispute focused primarily on Districts 23 and 25. The performance of CD 23 in electing minority candidates of choice was diminished in the enacted plan, and the parties disputed its status as an ability district. The Gonzales Intervenors argued that CD 25 was a crossover ability district[11] in the benchmark plan, and that it must be factored into the retrogressive effect analysis. The D.C. Court agreed that, as a legal matter, coalition[12] and crossover districts provide minority groups the ability to elect a preferred candidate and must be recognized as ability districts in a § 5 analysis, but that there "must be discrete data, by way of election returns, to confirm the existence of a voting coalition's electoral power."[13]

The D.C. Court further held that, to determine whether a redistricting plan has a discriminatory purpose, courts should utilize the framework in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), which asks

---

**9.** D.C. docket no. 106 (Order on State's Motion for Summary Judgment).

**10.** D.C. docket no. 115 (Memorandum Opinion).

**11.** The Supreme Court has defined a "crossover district" as "one in which minority voters make up less than a majority of the voting-age population" but "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and

who cross over to support the minority's preferred candidate." *Bartlett v. Strickland,* 556 U.S. 1, 13, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009).

**12.** A coalition district is a district in which two separate minority groups form a coalition to elect the candidate of the coalition's choice. *Bartlett v. Strickland,* 556 U.S. 1, 13, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009).

**13.** D.C. docket no. 115 at 36.

whether invidious discriminatory purpose was a motivating factor in the government body's decisionmaking. The D.C. Court concluded that Texas's failure to account for the significant increase of the Hispanic population did not establish a retrogressive effect, but is relevant to the evaluation of whether the congressional plan was enacted with a discriminatory purpose. The Court stated that it is "significant circumstantial evidence that the plan was enacted with the purpose of denying or abridging [the minority] community's right to vote." [14] The D.C. Court did not discuss the discriminatory purpose standard with regard to any particular district or area of the enacted plan, but concluded that Texas failed to demonstrate that the plan as a whole did not have the purpose of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

## D. This Court's November 26, 2011 map

In light of the fact that the enacted map had not yet gained preclearance and considering well-settled Supreme Court precedent providing that a legislative plan that has not obtained § 5 preclearance cannot be effective as law,[15] this Court sought to defer to the portions of the Legislature's plan that were unchallenged but otherwise to draw a plan that maintained the status quo so as not to interfere with the pending preclearance proceedings or put into effect a plan that might be denied preclearance. Following these guidelines, a majority of this Court issued a map on November 26, 2011. The State appealed, and the Supreme Court granted review. On January 20, 2012, the Supreme Court set forth new standards for the Court to follow given the procedural posture of the case.

## E. *Perry v. Perez*

In *Perry v. Perez*, the Supreme Court stated for the first time what standards should apply when a preclearance decision is pending at the time an interim map must be drawn. The Supreme Court held that, in drafting an interim plan, this Court "should take guidance from the State's recently enacted plan" to the extent the legislative policies underlying the plan do not lead to violations of the Constitution or the VRA. *Perez*, 132 S.Ct. at 941. The enacted plan "serves as a starting point" and "reflects the State's policy judgments on where to place new districts and how to shift existing ones in response to massive population growth." *Id.* At the same time, however, this Court must "take care not to incorporate into the interim plan any legal defects in the state plan." *Id.* Thus, where, as here, the State's plan "faces challenges under the Constitution or § 2 of the Voting Rights Act, a district court should still be guided by that plan, except to the extent those legal challenges are shown to have a likelihood of success on the merits." *Id.* at 942.

With regard to the pending preclearance proceedings and § 5 challenges, the Supreme Court noted that the calculus "is somewhat different" because only the D.C. Court may determine whether the state plan complies with § 5 and other courts "may not address the merits of § 5 challenges." *Id.* This Court "must there-

---

14.  D.C. docket no. 115 at 40.

15.  *See Clark v. Roemer*, 500 U.S. 646, 653, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991) (failure to obtain either judicial or administrative preclearance renders the voting change unenforceable); *see also Wise v. Lipscomb*, 437 U.S. 535, 542, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) ("A new reapportionment plan enacted by a State ... will not be considered 'effective as law' until it has been submitted and has received clearance under § 5. Neither, in those circumstances, until clearance has been obtained, should a court address the constitutionality of the new measure.") (citations omitted).

fore be careful not to prejudge the merits of the preclearance proceedings" and "should presume neither that a State's effort to preclear its plan will succeed nor that it will fail." *Id.* "The need to avoid prejudging the merits of preclearance is satisfied by taking guidance from a State's policy judgments unless they reflect aspects of the state plan that stand a reasonable probability of failing to gain § 5 preclearance." *Id.* And by "reasonable probability" the Supreme Court meant in this context "that the § 5 challenge is not insubstantial." *Id.* The Supreme Court noted that this "standard ensures that a district court is not deprived of important guidance provided by a state plan due to § 5 challenges that have no reasonable probability of success but still respects the jurisdiction and prerogative of those responsible for the preclearance determination." *Id.*

## II. Section 5 claims—Discussion

### A. "Not insubstantial"

As explained above, although the D.C. Court has exclusive jurisdiction over the merits of the § 5 challenges to the congressional plan, under the Supreme Court's newly announced standard for this interim plan, this Court must determine whether the claims asserted by the Defendants in the D.C. Court are "not insubstantial." In explaining this standard, the Supreme Court stated that it required a finding "that the relevant aspects of the state plan [stand] a reasonable probability of failing to gain § 5 preclearance" and

that the Court should follow legislative policies as set forth in the enacted plan where the § 5 challenges "have no reasonable probability of success." *Perez,* 132 S.Ct. at 942.

The parties dispute how to apply this standard in light of the circumstances of this case.[16] The parties dispute who has the burden of proof, given that the State maintains the burden of proof to obtain preclearance in the § 5 case. Texas argues that even though it has the burden of proof under § 5 in the D.C. Court, Plaintiffs should have the burden of proof for purposes of the interim plan because they are seeking to justify changes to the enacted plan.[17] Plaintiffs argue that, consistent with its burden in the D.C. Court to prove that the enacted plan does not violate § 5, Texas should have the burden of proof. This Court need not decide which party bears the burden of proof on a § 5 challenge when drawing an interim map, because none of the § 5 issues in this case turns on which party bears that burden.

The parties further dispute what the threshold should be for determining whether a claim is "not insubstantial." At the time the Supreme Court issued its decision on January 20, the D.C. Court had denied the State's motion for summary judgment on preclearance. Some parties, including the United States,[18] argue that the denial of summary judgment in itself means that the Defendants' claims in the D.C. Court are "not insubstantial." However, as noted by the State, the Supreme

---

**16.** Intervenor Congressman Joe Barton and a number of Plaintiffs urged the Court to await a preclearance decision rather than attempting to apply the "not insubstantial" standard. Docket nos. 621, 644. However, the fact that the Supreme Court provided a standard for the Court to apply before a preclearance ruling is made by the D.C. Court indicates that the Supreme Court did not intend for this Court to await a preclearance decision.

**17.** Docket no. 631 at 20.

**18.** Docket no. 591 at 5. The United States also argues that any aspect of the enacted plan on which the United States has posed an objection involves a "not insubstantial" § 5 claim. Though Texas does not agree with this point, Texas contends that this Court should give more weight to objections posed by the United States than other parties in the D.C. Court.

Court was aware of the denial of summary judgment at the time of its January 20 decision, and thus presumably would have so stated *if the denial of summary judgment should be equated with a conclusion that the claims were "not insubstantial."*

■ In addition, the D.C. Court's summary-judgment decision did not address specific areas of the congressional plan. The Supreme Court noted that this Court was correct to take guidance from the State's plan in areas where there was "no serious allegation" that the district lines had a discriminatory intent or effect, despite the D.C. Court's implication in its summary-judgment opinion that the Plan as a whole suffered from a serious allegation of discriminatory intent. Thus, the Court agrees that the denial of summary judgment alone does not render "not insubstantial" all claims asserted in the D.C. Court, and we will consider each claim to determine whether it is "not insubstantial."

### B. Section 5 challenges in the D.C. Court

Shortly after the Supreme Court issued its decision, the D.C. Court conducted its trial on the merits on the § 5 claims, and that entire record has now been submitted in this case. Given the exigencies of time, this Court is unable to review the entire record from the D.C. trial, but has reviewed the post-trial briefing in order to determine whether the claims are "not insubstantial." The Court will therefore summarize the various § 5 claims and issues from that briefing.

In its trial brief,[19] the United States argues that both the benchmark and enacted plans have a total of 10 ability districts, but that minority representation is proportionately decreased (retrogressed) in the enacted plan because minority voters would have the ability to elect in only 10/36 districts in the enacted plan, which is significantly less than the 10/32 ability present in the benchmark plan.[20] The United States contends that the appropriate inquiry for retrogression is whether the enacted plan is "more dilutive" than the benchmark retrogression is whether the enacted plan is "more dilutive" than the benchmark plan, and one way to assess this is to determine the gap between the actual number of minority ability districts and the number of districts that would be roughly proportional to the minority share of the citizen voting age population ("CVAP").[21] An increase in the gap between the benchmark plan and the enacted plan would be retrogressive.

Applying this measurement, the United States asserts that Black and Hispanic citizens combined constitute 39.3% of Texas's citizen voting age population, which would be approximately 13 (39.3% × 32 seats = 12.6) seats in the benchmark and 14 (39.3% × 36 seats = 14.1) seats in the enacted plan.[22] Thus, if there are 10 minority ability districts in the benchmark plan, there is a proportionality gap of three seats, which is increased to four seats in the enacted plan—*i.e.*, the gap increases by one seat. Accordingly, the United States contends that, to avoid re-

---

19. D.C. docket no. 203.

20. The United States relied on the expert testimony of Dr. Lisa Handley, who found that Districts 23 and 27 provided minority voters with the ability to elect preferred candidates in the benchmark but not in the enacted plan, but that the enacted plan includes two new minority ability districts (34 and 35). She thus concluded that the degree of minority under-representation increases by one district in the enacted plan and, alternatively, that minority proportionate representation decreased from 31.3% of districts in the benchmark plan to 27.8% of districts in the enacted plan. D.C. docket no. 202 at 9.

21. D.C. docket no. 203 at 14–15.

22. D.C. docket no. 203 at 15–16.

trogression based on such a gap increase, the enacted plan must have a minimum of 11 minority ability districts (in which case the gap of three seats remains constant).[23]

The United States argues that benchmark CD 23 was an ability district in the benchmark plan,[24] but that Texas eliminated the ability of minority voters in CD 23 to elect preferred candidates in the enacted map. Dr. Handley determined that CD 23's score on the exogenous [25] effectiveness index drops from 40% to zero in the enacted plan. Similarly, Dr. Alford's estimates show a decline from 46% to 29%, and the Texas Office of Attorney General's analysis indicates a drop from 30% to 10%.[26]

Regarding discriminatory purpose, the United States argues that the congressional plan was adopted with a discriminatory purpose because Texas intentionally used racial means to achieve a preferred partisan outcome. Further, the United States argues, Texas chose not to create any new minority ability districts despite the huge

Hispanic population growth, and chose to remove hundreds of thousands of minority voters from districts in which they could elect their preferred candidates under the existing plan. The United States argues that this goal was achieved in part by intentionally splitting a number of cohesive minority communities and elsewhere packing minorities into existing ability districts to avoid creating any such new districts. The United States asserts that this occurred in the DFW area. The United States contends that Texas split precincts to draw boundaries using racial data.[27]

In support of its claim that Texas acted with a discriminatory purpose, the United States relies on several pieces of evidence. The first piece is an email from Eric Opiela to Gerardo Interiano, sent in November 2010 when they were both on staff for Texas House Speaker Joe Strauss. Opiela suggested that they should calculate Spanish Surname Turnout/Total Turnout ratio for all VTD's [28] for the 2006 to 2010 gener-

---

**23.** The United States notes that this number does not rest on a determination that benchmark CD 25 provides minority voters with the ability to elect preferred candidates. D.C. docket no. 203 at 16 n. 9. The United States does not take the position that CD 25 was an ability district in the benchmark plan.

**24.** The United States asserts that the district's very creation in 2006 as a minority opportunity district to remedy the § 2 violation found by the Supreme Court in *LULAC v. Perry*, 548 U.S. at 425–42, 126 S.Ct. 2594, is indicative of its status as a protected district under § 5. Further, the United States notes that Hispanics in the district succeeded in electing their preferred candidate to Congress in 2006 and 2008, and that candidate's loss in the 2010 election (the year of the Republican landslide) does not establish that the district lost its ability-to-elect status. D.C. docket no. 203 at 16–17. The United States' expert, Dr. Lisa Handley, also uses the Endogenous Effectiveness Index, which measures the percentage of contests since the district was drawn that the minority-preferred candidate won, to conclude that CD 23 was an ability district in the

benchmark plan. An endogenous election analysis for a district measures the ability of minorities to elect minority-preferred candidates for the district itself. Because CD 23 was drawn in 2006, there are only three endogenous election contests to consider—2006, 2008, and 2010. D.C. docket no. 161–5 (Dr. Handley's Report) at 4.

**25.** Exogenous election analysis measures the ability of a set of statewide minority-preferred candidates to carry the congressional district at issue. Report of Dr. Lisa Handley, D.C. docket no. 161–5. "Exogenous elections are elections that are outside of the district at issue. Endogenous elections are elections that involve the district at issue." *Cottier v. City of Martin*, 445 F.3d 1113, 1121 n. 5 (8th Cir.2006).

**26.** D.C. docket no. 203 at 17.

**27.** D.C. docket no. 203 at 19.

**28.** A "VTD" is a voter tabulation district and is the functional equivalent of a voting precinct.

al elections because "[t]hese metrics would be useful in identifying a 'nudge factor' by which one can analyze which Census blocks, when added to a particular district (especially 50+1 minority majority districts) help pull the district's total Hispanic Pop and Hispanic CVAPs up to majority status, but leave the Spanish Surname RV and TO [29] the lowest" and "[t]his is especially valuable in shoring up Canseco and Farenthold [two Republican incumbents]." The United States further asserts that CD 23 demonstrates that the mapdrawers were successful in achieving Opiela's stated goal because high-performing Hispanic precincts in Maverick County and the South Side of San Antonio were swapped out, and elsewhere precincts with higher Spanish Surname Voter Registration ("SSVR") but lower turnout were swapped in.

The United States further contends that split precincts are the most probative circumstantial evidence of a discriminatory purpose because no partisan data is available below the precinct level, and the 518 split precincts in the congressional plan are "unexplainable on grounds other than race." [30] The United States contends that the congressional plan splits precincts "in a manner that divides racial groups and weakens minority voting strength with alarming consistency, and a political justification does not explain this racially discriminatory pattern." [31] The United States asserts that the concentration of split precincts in minority communities will have a disparate impact on minority voters because of expense and voter confusion, resulting in lower minority turnout.

Last, the United States contends that African American members of Congress Eddie Bernice Johnson, Sheila Jackson Lee, and Alexander Green and their districts were treated in a discriminatory manner by the mapdrawers because key economic features were removed from the districts. [32] Each of these representatives' offices was drawn out of their respective districts, and Johnson's home was drawn out of her district. These problems were not remedied despite the members' efforts. [33] In contrast, the United States contends, the evidence shows that Anglo members of Congress were treated preferentially, with even minor requests accommodated and special projects drawn into their districts. [34] At trial, Gerardo Interiano stated that the disparate treatment was mere "coincidence," and the United States asserts that this explanation is implausible. [35]

The Texas Latino Redistricting Task Force asserts that changes to CD 23 were retrogressive in effect and had a discriminatory purpose. [36] The Task Force asserts that "Ryan Downton testified that while creating CD 23, he swapped precincts into and out of the district based on Spanish surnamed voter registration and political performance even though he was aware that he might be selecting precincts for inclusion into CD 23 in which Latino turnout was lower than other precincts." [37]

29. "RV" stands for "registered voters." "TO" stands for "turnout."

30. D.C. docket no. 203 at 22.

31. D.C. docket no. 203 at 22.

32. D.C. docket no. 203 at 26.

33. D.C. docket no. 203 at 26.

34. D.C. docket no. 203 at 26.

35. D.C. docket no. 203 at 26. The NAACP makes similar claims in its post-trial brief. D.C. docket no. 198.

36. D.C. docket no. 206.

37. D.C. docket no. 206 at 10. Ryan Downton was general counsel to the Texas House Committee on Redistricting and was involved in drawing the congressional plan.

And "[d]espite the fact that the population of CD 23 was approximately 149,000 over the ideal district size, Mr. Downton moved a much larger number of 380,677 people out of the benchmark CD 23 [and] moved 231,514 new people into CD 23."[38] The Task Force asserts that, throughout the process, "Mr. Downton reported on his progress to ensure that CD23 would only elect the candidate of choice in one out of ten elections. (FOF at ¶ 291 ("Have it over 59% HCVAP, but still at 1/10."))."[39]

The Task Force further complains that the enacted plan's "removal of Nueces County from the configuration of Latino opportunity districts in South and West Texas not only purposefully deprives thousands of Latino voters in Nueces County the opportunity to elect their preferred candidate—the change further makes impossible the creation of seven Latino opportunity districts in South and West Texas."[40] The Task Force asserts that Texas could have enacted a plan with 7 ability districts in South and West Texas, but chose not to.

The Gonzalez Intervenors and LULAC argue that the enacted plan is retrogressive because it reduces the number of minority ability districts from 11 to 10, and intentionally dismantles three minority-ability districts (23, 25, and 27).[41] Thus, minority representation is reduced from 34% to 28% of districts, even though minorities accounted for most of the population growth that entitles Texas to four new congressional seats. These parties contend that Texas officials ignored the protections of the VRA and intentionally discriminated against minorities by carving up ability districts. Despite enormous Hispanic population growth and the relatively small increase in Anglo population, they argue, Texas's enacted plan actually decreases the number of Hispanic ability districts by one (from eight to seven) and increases the number of Anglo districts by five.[42]

The Gonzalez Intervenors and LULAC point to the email from Opiela to Interiano revealing a racial purpose behind the configuration of CD 23,[43] the intentional destruction of an effective coalition of Hispanic, African–American, and Anglo voters in CD 25, and the dismantling of CD 27 by moving more than 200,000 Hispanics in Nueces County into an Anglo district

38. D.C. docket no. 206 at 10 (citation omitted).

39. D.C. docket no. 206 at 10. "FOF" refers to proposed findings of fact filed by the Task Force in the D.C. Court.

40. D.C. docket no. 206 at 15.

41. D.C. docket no. 207.

42. D.C. docket no. 207 at 5. According to the brief, between 2000 and 2010, Hispanic population grew from 6.7 million to 9.5 million, a 42% increase; Black population increased by 526,000 (23%) and White population increased by 457,000 (4.1%). *Id.*

43. D.C. docket no. 207 at 6. The Gonzalez Intervenors and LULAC rely on the expert testimony of Dr. Stephen Ansolabehere to show that CD 23 is no longer an ability district. These parties further contend that the State's goal with regard to CD 23 was "to make CD 23 appear falsely to be a minority-ability district." *Id.* Looking at the various areas that were kept in CD 23 and those that were moved in and out, the area kept in CD 23 has the highest percent Anglo population, the highest turnout, and the lowest support for minority-preferred candidates; the area removed has the lowest percent Anglo population and highest combined Black and Hispanic population, somewhat lower turnout, and highest support for minority preferred candidates; and the area added to CD 23 has the highest percent Hispanic population but the lowest turnout rate and somewhat lower support for minority preferred candidates than the areas taken out. *Id.* This combination of population changes reduced the electoral performance of minority preferred candidates by 3 to 4 %. *Id.* at 7.

where they lose the ability to elect their preferred candidates.

The Gonzalez Intervenors focus on CD25, which they assert is a crossover district that must be recognized as an ability district in a § 5 retrogression analysis. They assert that they have provided extensive, unrefuted evidence of election returns and other information establishing that benchmark CD 25 was an effective crossover district in which Hispanics and Blacks were able to elect the candidates of their choice because of voting cohesion between minorities and because a significant portion of Anglos (but not a majority) consistently voted for the minority-preferred candidate.[44] The Gonzalez Intervenors contend that the dismantling of this effective crossover district constitutes retrogression.

With regard to discriminatory purpose, the Gonzalez Intervenors rely on the following evidence: (1) the statewide disproportionate impact of the plan on minorities[45]; (2) the specific disproportionate impact and ripple effects resulting from the Legislature's discriminatory treatment of Hispanics in Nueces County[46]; (3) the history of discrimination against Blacks and Hispanics in Texas; (4) the specific sequence of events leading to the adoption of the plan; and (5) contemporaneous statements of Legislators and staff demonstrating a discriminatory purpose.

LULAC also contends that the enacted map intentionally fractures minority neighborhoods in the DFW area, specifically focusing on Districts 6, 12, 26, and 33.[47] LULAC notes that each district is bizarrely shaped to unnaturally avoid creation of majority-minority districts in that area and to ensure Anglo–dominated districts. LULAC further contends that CD 30 is packed with excessive minority population and thus "wastes" minority votes. LULAC relies on evidence of historical discrimination, the unusual process leading to passage of the plan, and contemporary statements by members of the decision-making body that exhibit racially discriminatory intent. LULAC contends that even if there are 11 ability districts in the enacted plan, "the new plan would still be retrogressive because the level of representation statewide would be reduced."[48]

In its trial brief,[49] Texas argues that the only proper way to determine retrogres-

---

44. D.C. docket no. 207 at 9.

45. D.C. docket no. 207 at 17. According to the Gonzalez Intervenors, although Anglos constitute approximately 45.3% of the total population of Texas, they are an outright majority of the population in 20 of the 36 districts, and a plurality in 3 more, for a total of 64% of congressional districts. And although the statewide percentage of Anglo voters decreased, the number of districts in which Anglos are a majority of the citizen voting age population increased from 22 to 25 (69% of districts).

46. D.C. docket no. 207 at 20. These parties argue that the Legislature could have chosen to take the Nueces County Hispanic population and use it to help construct a seventh majority Hispanic district in the Rio Grande Valley, but instead chose to remove them from South Texas and put them in an Anglo district where they are effectively stranded. Thus, they argue, this decision eliminated the possibility of creating an additional minority Hispanic district without destroying CD 25 to create CD 35, and also left no flexibility for the creation of an additional Hispanic seat in Harris County. These parties argue that alternative plans did not create these problems.

47. D.C. docket no. 205 at 7. The Task Force also contends that the State had an improper racial purpose in districting in the DFW area. D.C. docket no. 206 at 16.

48. D.C. docket no. 205 at 17.

49. D.C. docket no. 201. In its brief, Texas reserved its argument that minority voters have the ability to elect in any district where a single minority group constitutes greater than 50% of the citizen voting age population.

sion of ability to elect is to use exogenous elections for the benchmark and enacted plans. Because endogenous elections can only be examined for the benchmark district, Texas asserts, "endogenous election analysis does not permit a '*comparison* of a jurisdiction's new voting plan with its existing plan.'"[50] Texas asserts that its functional analysis is preferable to the United States' analysis because it uses more statewide elections weighted toward more recent elections and measures the statewide ability to elect minority-preferred candidates across all districts at issue.[51] Even if the United States' approach is required, the State argues that it is still appropriate to use exogenous elections weighted toward more recent contests.

Applying its statewide functional analysis, Texas argues, the congressional plan does not retrogress minority voting strength but in fact "substantially improves Hispanic voting strength."[52] Relying on the testimony of its expert Dr. Alford, Texas contends that minority-preferred candidates win 13 additional statewide contests in the enacted plan over the benchmark, which demonstrates that no retrogression occurred. Using the binary approach espoused by the United States requires the same conclusion, Texas asserts. Texas contends that the United States improperly counts CD 23 as an

ability district in the benchmark but not the enacted plan, "despite the fact that minority voters elected their candidate of choice less than half the time under both the five- and ten-election exogenous indices."[53] Texas argues that "the United States converts CD23 from non-performing to an ability district based on erroneous endogenous analysis" and its methodology is inappropriate for CD 23 "because it relies on a meager three cherry-picked elections."[54]

Texas further disputes the Gonzales Intervenors' claim that CD 25 is a protected ability-to-elect district in the benchmark plan, asserting that the United States has not taken that position.[55] Texas contends that CD 25 is not a protected coalition or crossover district because (1) it has an Anglo CVAP over 60%, a Hispanic CVAP ("HCVAP") of 25%, and a Black CVAP under 10%; (2) Anglos do not vote as a bloc to defeat minority-preferred candidates; and (3) minorities do not vote cohesively in Democratic primaries.[56] Accordingly, Texas contends, CD 25 does not factor into the retrogressive effect analysis.[57]

With regard to the discriminatory purpose inquiry under § 5, Texas emphasizes that both a discriminatory purpose and effect are required to find a violation (*i.e.,* disparate impact is alone insufficient). Thus, Texas argues, the inquiry must be

50. D.C. docket no. 201 at 4 (quoting *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 478, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (emphasis added)).

51. D.C. Docket no. 201 at 5.

52. D.C. docket no. 201 at 15.

53. D.C. docket no. 201 at 16.

54. D.C. docket no. 201 at 16.

55. D.C. docket no. 201 at 16 ("Neither Texas nor the United States takes that position.").

56. D.C. docket on. 201 at 16.

57. Texas further argues that the D.C. Court should reconsider its prior decision that coalition and crossover districts are protected ability districts for § 5 purposes in light of the Supreme Court's decision in *Perry v. Perez.* Texas argues that such districts are not protected, but even if they are, the minority coalition must be shown to vote cohesively in the primary.

whether the Legislature enacted the plan because of its effect on race, not "in spite of" its known effects on race. Texas contends that the districting decisions have race-neutral explanations, and thus discriminatory purpose cannot be found even if the Legislature knew that the race-neutral purposes would disparately impact racial minorities. Texas asserts that the Defendants rely on four principal arguments to support the purposeful discrimination claim: (1) the lack of proportional representation; (2) the configuration of CD 23; (3) the configuration of CD 26; and (4) alleged disparate treatment of Black members of the congressional delegation.[58]

With regard to the lack of proportional representation, Texas argues that proportional representation is expressly not required by the VRA. Thus, Texas contends, once it drew one additional minority opportunity district that it believed to be required, it lacked a "strong basis in evidence" to conclude that consideration of race was "reasonably necessary" to satisfy either § 2 or § 5 of the VRA, and it risked violating the Equal Protection Clause if it sought to create additional districts based on race.[59]

Texas disputes the allegations related to CD 23 by arguing that (1) Downton testified that he did not use voter turnout statistics to draw CD 23; (2) there is no evidence Opiela played a role in drawing CD 23; (3) Downton testified that he had

the legitimate goal of protecting a Latino Republican incumbent (Canseco); (4) Downton could not target low-turnout Hispanics because RedAppl[60] does not have such functionality; and (5) the evidence shows that Hispanics in enacted CD 23 are actually more likely to turn out on election day.[61]

Texas further contends that it did not draw the CD 26 "lightning bolt" in DFW with a discriminatory purpose, noting that the benchmark plan already contained a southern protrusion extending from Denton into Tarrant County, which was not disturbed by the Supreme Court in LU-LAC, and that this protrusion was narrowed to accommodate requests from Republican U.S. Representative Kay Granger and Democratic State Representative Marc Veasey. Texas argues that both in the benchmark and enacted plan, the protrusion contains a high concentration of Democratic voters consistent with a political purpose. Texas contends that because the configuration of the district is equally consistent with a race-neutral purpose, the fact that it may have disparately affected minorities does not establish impermissible purpose.

Last, with regard to the allegations that the Legislature intentionally snubbed minority-preferred members of Congress, Texas contends that the Legislature attempted to accommodate requests from

---

58. D.C. docket no. 201 at 26.

59. D.C. docket no. 201 at 26. During redistricting and throughout the litigation, Texas has maintained the position that § 2 does not require the State to draw minority coalition districts. Thus, the State steadfastly refused to create any coalition districts, and the State's arguments are made entirely in the context of minority opportunity districts in which one single minority or language group constitutes a working majority of the population of the district. As discussed, *infra*, the Court is unable to conclude that Plaintiffs are

likely to succeed on those § 2 claims that are based on a coalition of minority voters.

60. RedAppl is the State's districting software program. As described by the Supreme Court in *Bush v. Vera*, 517 U.S. 952, 960, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996), "RE-DAPPL permit[s] redistricters to manipulate district lines on computer maps, on which racial and other socioeconomic data [are] superimposed."

61. D.C. docket no. 201 at 27–28.

lawmakers, but did not make a concerted effort to solicit redistricting preferences of representatives from either party. Because the mapdrawer did not know where the district offices were located, Texas contends that at most it "was guilty of blithe indifference to the wants of certain Congressmen," which does not violate the Constitution or the VRA.

### III. Plan C226—a proposed compromise map

In order to permit the primary elections to go forward in a timely manner, some Plaintiffs and Intervenors conferred and developed a compromise map that they submitted to the Court for consideration. The compromise map attempts to address those § 5, § 2, and Fourteenth Amendment claims that are "fairly at issue" and thus within the scope of this Court's remedial authority. The map is endorsed by the Texas Latino Redistricting Task Force and by Congressmen Cuellar and Canseco.[62] C226 is opposed by Intervenor Congressman Joe Barton.[63] It is also opposed by MALC in part [64] and by the Rodriguez Plaintiffs, Quesada Plaintiffs, LULAC, Texas NAACP, and the African–American Congressional Member Plaintiffs.[65] The Court has independently reviewed as much

of the record as possible and it has carefully evaluated all of the arguments in opposition to Plan C226 in deciding whether it would be an acceptable interim plan.

Although, as noted, several parties have urged the Court to wait for a decision on preclearance from the D.C. Court, the Court heard testimony from the parties that in order to proceed with a May 29 primary, a map needed to be in place by March 3. Thus, the Court concluded that it could not wait for a decision from the D.C. Court without further delaying the primary and causing substantial hardship to the Republican and Democratic parties, which have scheduled their conventions for June. Releasing a map in time for a unified May 29 primary avoids a split primary and the resulting costs and burdens on the counties and political parties, which must administer and conduct the elections.[66]

### A. Analysis of C226

█ The Court has independently evaluated the proposed compromise map, C226, and concludes that it sufficiently resolves the "not insubstantial" § 5 claims and that no § 2 or Fourteenth Amendment claims preclude its acceptance under a preliminary injunction standard. The Texas Leg-

---

**62.** Docket nos. 606, 610, 613, 676. The Task Force Plaintiffs note that C226 does not necessarily address or resolve all of their claims, but they agree that it is an acceptable compromise to permit the primary elections to occur without further delay.

**63.** Docket no. 609, 621. Congressman Barton urges the Court to wait for a preclearance decision from the D.C. Court before drawing any interim map. In the alternative, Barton also submits a proposed interim map, C227.

**64.** Docket no. 671 (arguing that CD 23 in C226 incorporates legal defects from the enacted plan). Plaintiff MALC states that C226 adequately addresses its claims in some areas, but it is not the only way to remedy the alleged constitutional and statutory violations. Docket no. 665.

**65.** Docket no. 659; docket no. 664 (discussing objections to CD 33 and proposed alternative plan).

**66.** *See* January 27, 2012 hearing transcript, in which the parties presented evidence of logistical difficulties with having an election in June, since many public facilities and schools are closed, the significant cost to political parties who have already contracted for and placed deposits on Convention facilities in June, and the extremely high (and unbudgeted) costs to counties of a split primary, and corresponding voter fatigue. *See also id.* Tr. 148 (testimony that a split primary would cost Bexar County an estimated additional $375,000).

islative Council, however, has identified what appear to be inadvertent intrusions of congressional districts into six different counties. These intrusions consist of either one or at most several census blocks and all contain either no people or very few people. The boundaries between districts otherwise follow the county lines in the areas of the intrusions. Elimination of these intrusions can be accomplished with minimum population deviation and avoids the possibility that a county will have to fashion a voting precinct consisting of no people or very few people because of a map-drawing error. Accordingly, the Court finds that Plan C235, which corrects these technical errors contained in Plan C226, can be adopted as the interim plan.

## B. District 23

The Court finds that the § 5 retrogressive effects claim with regard to CD 23 is not insubstantial. The effects prong requires a comparison between CD 23 in the benchmark and CD 23 in the enacted plan. The parties vigorously dispute the appropriate method for determining whether CD 23 was or is an ability district and for comparing the status of CD 23 between the two plans. The United States endorses using endogenous election data for benchmark CD 23, and notes that six different Circuit Courts of Appeals have determined that endogenous elections are the most probative and relevant contests when assessing racially polarized voting.[67] The United States further asserts that Texas's argument in favor of exogenous elections conflicts with its expert's (Dr. Alford) previous statements that endogenous elections are more probative than exogenous elections.

Texas argues that because endogenous election analysis can only be conducted for the benchmark plan, it does not fairly permit a comparison with the enacted plan, and thus exogenous elections, which can be conducted for both plans, should be used. Determining which method to use for making the retrogressive effects comparison between benchmark and enacted plans is an issue that must be resolved by the D.C. Court. The Court finds that whether CD 23 is effectively retrogressed is a not insubstantial § 5 claim.

Because the § 5 retrogressive effects claim regarding CD 23 is not insubstantial, the Court cannot incorporate enacted CD 23 into the interim plan. C235 attempts to adjust CD 23 to account for the § 5 claims. The parties dispute the degree to which it has effectively done so. The Texas Latino Redistricting Task Force asserts that C235 restores CD 23 insofar as the win-loss record of Latino preferred candidates is similar to benchmark CD 23. The Task Force analyzed 12 racially contested exogenous elections from 2002–2010 in which Latinos sought to elect a Latino candidate, and on average the Latino preferred candidates in CD 23 in Plan C235 garnered within half a percentage point (less) of the support they garnered in benchmark CD 23.[68] Congressman Canseco also argues that CD 23 has been restored.[69]

MALC and other Plaintiffs contend that CD 23 has not been fully restored because its actual performance in terms of votes is less than it was in the benchmark. Specifically, these Plaintiffs contend that in almost all elections, the choice of the Hispanic voters does slightly more poorly than in the benchmark.

---

67. D.C. docket no. 203 at 3–4 (listing cases).

68. Docket no. 638 at 35 (and docket no. 638 Ex. S).

69. Docket no. 676.

The Court has carefully considered these arguments. The State has demonstrated that election performance has been restored to the benchmark level of 3 out of 10 racially contested exogenous general elections.[70] A report prepared by the Texas Legislative Council also demonstrates that performance levels in terms of win-loss numbers have been restored to benchmark levels under the United States' preferred methodology developed by Dr. Handley. And the Texas Latino Redistricting Task Force's analysis demonstrates that CD 23 has a comparable win-loss record to the benchmark district. The Court therefore concludes that it has been sufficiently restored to benchmark level, even if the margin of victory has slightly decreased.

Because C235 restores CD 23 to benchmark performance, and Plaintiffs argued that CD 23 in the benchmark was an opportunity district, C235 also resolves the Plaintiffs' § 2 claims premised on the alleged failure to include 7 Latino opportunity districts in South/Central/West Texas. Accordingly, the Court need not consider the merits of those claims, and makes no ruling on whether CD 23 is an opportunity district in the enacted map. The Court also need not decide whether the § 5 discriminatory purpose claims related to CD 23 are not insubstantial.

## C. Statewide Retrogression (United States)

As noted above, to avoid an increase in the "gap," the United States asserts that any interim map must have at least 11 ability districts. The United States further asserts that retrogression is measured on a state-wide basis, so any retrogression in a particular district can be cured by creating new districts anywhere in the State.[71] The Court need not decide whether this claim is "not insubstantial" because C235 addresses the United States' concerns by including 11 districts that the United States would consider ability districts.

## D. Dallas–Fort Worth area

C235 also makes substantial changes to the Dallas–Fort Worth area. As noted by the Supreme Court in *Perry v. Perez*, aspects of the enacted map's configuration of the Dallas–Fort Worth area "appear to be subject to strong challenges in the § 5 proceeding." *Perez*, 132 S.Ct. at 944. In making this statement, the Court cited to a portion of the United States' brief in the D.C. Court, in which it asserted that "the minority population [in DFW] was purposely manipulated to decrease current and future minority voting strength" and that "the State has pulled strangely-shaped minority population areas out of certain districts in order to submerge them in larger Anglo populations and to reduce minority voting strength."[72] The United States further asserted that "[t]he data utilized in making some of these changes were race-based, as opposed to partisan."[73] The Supreme Court also cited to exhibits showing that the CD 26 "lightning bolt" extending into CD 12 contains concentrated Hispanic populations.

In its trial brief in the D.C. Court, the United States asserts that the intentional cracking of minority populations is clearest in CD 6, in which there are 39 VTD splits in the "finger" that reaches up from majority Anglo Ellis and Navarro Counties to remove large concentrations of African–American and Hispanic population from Dallas and Tarrant Counties, and 28 of the 39 split VTDs are in majority minority

---

**70.** Docket no. 675 at 3.

**71.** Docket no. 630 at 2.

**72.** D.C. docket no. 79–2 at 36, 38.

**73.** D.C. docket no. 79–2 at 38.

precincts.[74] These splits also divide minority communities of interest in Arlington, Cedar Hill, and Duncanville into three different congressional districts.[75] Similarly, in CD 26, there are 49 split precincts, 38 of which are within the "lightning bolt" coming down into Tarrant County.[76] The United States asserts that the eastern edge of the lightning bolt divides African–American communities from Hispanic communities according to race, and because the area is homogeneously Democratic, the split could not have been guided by political data.[77]

LULAC also argued in the D.C. Court that the enacted map intentionally fractures minority neighborhoods in the DFW area, specifically focusing on districts 6, 12, 26, and 33.[78] LULAC notes that each district is bizarrely shaped to unnaturally avoid creation of majority-minority districts in that area and to ensure Anglo-dominated districts. The D.C. Defendants

further contend that CD 30 has been "packed" with additional minority population that was not necessary for minorities to continue to elect their preferred candidate, which intentionally "wastes" minority votes.[79]

The D.C. Defendants assert classic "cracking" and "packing" intentional vote dilution discrimination claims.[80] Although minorities are more than 50% of the combined population of Dallas and Tarrant Counties, in only two of the eight districts in the enacted plan that include parts of Dallas and Tarrant Counties do minorities make up more than 50% of the voting age population.[81] Although the D.C. Defendants contend that populations were split along racial lines to dilute minority voting strength, Texas contends that disparate impact does not establish discriminatory intent and that there are race-neutral explanations for the district lines. Texas argues that it engaged in political gerry-

74. D.C. docket no. 203 at 22.

75. D.C. docket no. 203 at 22.

76. D.C. docket no. 203 at 23.

77. D.C. docket no. 203 at 23. The United States makes these same arguments before this Court in support of its position that there is a reasonable probability that Texas will fail to gain preclearance in this area. Docket no. 630 at 14.

78. D.C. docket no. 205 at 7.

79. D.C. docket no. 205 at 8.

80. See Voinovich v. Quilter, 507 U.S. 146, 153–54, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). In Voinovich, the Supreme Court noted that "[d]ividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victo-

ry." Id. at 153, 113 S.Ct. 1149. This is "cracking" the minority population. The Court further described how "packing" dilutes minority voting strength: "A minority group, for example, might have sufficient numbers to constitute a majority in three districts. So apportioned, the group inevitably will elect three candidates of its choice, assuming the group is sufficiently cohesive. But if the group is packed into two districts in which it constitutes a super-majority, it will be assured only two candidates." Id. at 153–54, 113 S.Ct. 1149.

81. In CD 6, Black plus Hispanic voting age population is 51.5% and in CD 30, the allegedly packed district, Black plus Hispanic voting age population is 81.5%. In districts 5, 12, 24, 26, 32, and 33, Black plus Hispanic voting age population is between 30.3% and 35.5%. Further, there is only one district in which Blacks and Hispanics make up more than 40% of the citizen voting age population, and they make up 74% of that district (CD 30). Black plus Hispanic citizen voting age population is 24.8% in CD 5, 38.8% in CD 6, 28.3% in CD 12, 21.2% in CD 24, 22.2% in CD 26, 23.3% in CD 32, and 25.9% in CD 33.

mandering, and that it may do so regardless of its awareness of an adverse effect on minorities. Texas further asserts that splitting precincts is permissible and there is no basis for concluding that split precincts are evidence of an impermissible racial purpose.

More specifically, Texas argues that the CD 26 "lightning bolt" is similar to the one in the benchmark, and points to a political shading exhibit that demonstrates that the "lightning bolt" contains high concentrations of Democrats, who just happen to be minorities. However, Texas's post-trial briefing fails to counter Plaintiffs' allegations with regard to CD 6 and CD 33, or the alleged packing of CD 30. Although it is difficult to tell whether lines were drawn on partisan or racial considerations, the high number of split precincts in the protrusions increases the likelihood that the mapdrawers were focused on race, because partisan voting data is not available below the precinct level. Further, Texas has not offered any explanation why the precincts were split or demonstrated that political explanations are more likely than racial ones. Whether the district lines are better explained by politics or racial considerations is a not insubstantial issue that must be decided by the D.C. Court. Accordingly, this Court may not incorporate the enacted plan's configuration of DFW districts.

C235 attempts to address the § 5 claims that are not insubstantial in its configuration of DFW districts. The Latino Task Force contends, with no objection from the State, that C235's DFW configuration addresses the § 5 claims by modifying districts 6, 12, 26, 30, and 33 from the enacted plan. Specifically, it withdraws the encroachments into minority communities from the Anglo districts surrounding DFW, including the CD 26 "lighting bolt" into CD 12 and the encroachments from CD 6 and CD 12 into minority areas. "The population left behind in Dallas and Tarrant Counties is encompassed" by the new CD 33, and "CD 33 is moved eastward to fill in the space created by retracting CDs 6, 12, and 26 towards their population bases." [82] The Court further notes that the packing allegations are addressed, as the minority population of CD 30 is decreased. [83]

C235 proponents note that it is not possible to simply undo the alleged discrimination by returning to the benchmark because of population growth and the addition of new seats. [84] The Latino Task Force contends that the DFW configuration follows traditional redistricting criteria: accommodating the fastest population growth in the region and accommodating the wishes of congressional incumbents. [85] Specifically, the configuration accommodated the desires of congressional incumbents to maintain their population bases and geographic areas of special concern. Further, the borders of CD 33 are drawn to leave CD 24 unchanged from the enacted map, to work with the existing boundaries of CD 32 in Dallas County, and to make minimal changes to CD 30 except as to accommodate claims from the incumbent. C235 proponents note that the changes to the DFW area actually make the districts more compact

82. Docket no. 638 at 37–38.

83. According to the NAACP's trial brief in the D.C. Court, benchmark CD 30 was 76.7% Hispanic plus Black voting age population, and enacted CD 30 was 81.5% Hispanic plus Black voting age population. D.C. docket no. 198 at 11. According to the Red–100 report prepared by the Texas Legislative Council, CD 30 in Plan C235 is 75.9% Hispanic plus Black voting age population.

84. Docket no. 660 at 4.

85. Docket no. 638 at 37.

as a whole, that race did not predominate, and that CD 33 reflects population growth.

The Court concludes that CD 33 is not a minority coalition district and was not drawn with the intention that it be a minority coalition district. Opponents of the compromise map argue that it does not go far enough to cure the fragmentation, especially with regard to African Americans, and suggest a plan where "all of the key Hispanic and African American neighborhoods in Fort Worth are united into CD33." [86] However, the interim plan must address the allegations of discrimination without going beyond them. C235 adequately does so. Thus, the lightning bolt and other incursions are removed, but it would be inappropriate to intentionally create a coalition district on the basis of race or otherwise intentionally unite populations based on race. The contours of CD 33 are a result of addressing the "not insubstantial" § 5 claims of cracking and packing and the application of neutral redistricting criteria. Thus, although race was necessarily considered in drawing CD 33 to some degree, the use of race was appropriate to remedy the alleged race-based discrimination that occurred and does not exceed what is constitutionally permissible.

The Court finds that C235 adequately resolves the "not insubstantial" § 5 claims but goes no further than required under *Perry v. Perez.* The Court need not analyze Plaintiff's Fourteenth Amendment claims related to DFW because they are resolved by C235.

Further, the Court cannot conclude at this time that Plaintiffs are likely to succeed on the merits of their claim that § 2 requires a Latino opportunity district in DFW. Only one demonstration map contained a district with a majority Hispanic citizen voting age population (C 190), and that district was not reasonably compact and would not likely survive strict scrutiny under the Supreme Court's equal protection jurisprudence. All other demonstration maps contained either inadequate Latino opportunity districts in terms of Hispanic citizen voting age population or coalition districts. As noted below, the Court is unable to conclude at this time that Plaintiffs are likely to succeed on their § 2 claims premised upon coalition districts.

## E. Districts Represented by African–American Congresspersons

C235 makes changes to CDs 9 and 18 in the Houston metropolitan area and CD 30 in Dallas to address claims that the Legislature intentionally discriminated against the three African–American plurality and majority districts (which are also represented by African Americans). The United States contends that there is a reasonable probability that Texas will not gain preclearance regarding these districts because they were drawn with discriminatory purpose.[87] The United States asserts that substantial evidence was presented at the D.C. trial that the map drawers removed economic engines from these districts and had drawn members' offices out of each of their districts. In contrast, minor requests by Anglo Members of Congress were accommodated, with one Member asking for a San Antonio country club to be put in his district (Rep. Lamar Smith), another wanting his grandchildren's private school in his district (Rep. Kenny Marchant), and still another asking that her campaign office be moved back into her district (Rep. Kay Granger).[88] That

---

86. Docket no. 659 at 13.

87. Docket no. 630 at 14–15.

88. The NAACP makes similar claims in D.C. and in this Court. In docket no. 625, the NAACP and the Individual Representatives contend that "the State redrew districts 9 and

said, at least one Anglo Congressman, Lloyd Doggett, had his entire district dismantled in a manner that may unseat him, and was arguably treated worse than were the African American members.[89]

The United States asserts that there is a reasonable probability that Texas will not gain preclearance because it fails to adequately explain this disparate treatment, and its claim that the disparate treatment was merely coincidental is implausible. Texas itself has urged the Court to give greater deference to objections made by the United States in the preclearance proceedings. The United States contends that the claims related to the unequal treatment of minority districts represented by African–American members of Congress are "not insubstantial."[90] The Court agrees—though Texas contends that any disparate treatment was simply inadvertent, the mapdrawers took care to accommodate even minor concerns of Anglo congresspersons and failed to ensure that any requests of the three African–American members were considered or accommodated. Whether the disparate treatment was purposeful or inadvertent is a not insubstantial issue to be resolved by the D.C. Court.

C235 attempts to provide an interim remedy to resolve these complaints by redrawing the districts to include member offices and homes, and to restore economic engines to the district. Though Rep. Johnson has complaints about other areas being removed from CD 30, the Court cannot ensure that all requests are accommodated. Rather, C235 seeks to remedy the alleged discrimination that occurred. Insofar as C235 is not purposefully dis-

criminatory and is not alleged to be retrogressive with regard to these districts, the Court cannot remedy all asserted deficiencies in the districts under C235.

## F. Central Texas/CD 25/CD 35

C235 retains the configuration of CD 35 and CD 25 from the enacted plan. It is undisputed that much of Texas's overall population growth occurred in Bexar County and Travis County and areas along the I–35 corridor. Therefore, it is unsurprising that the Legislature's enacted map placed a new district in that area—CD 35. CD 35 connects communities in Austin/Travis County and San Antonio/Bexar County, and the northern portion of CD 35 includes the bulk of the Hispanic minority population in Austin/Travis County that was formerly in CD 25. It is undisputed that CD 35 is a Latino majority district.

Certain Plaintiffs, but primarily the Rodriguez Plaintiffs, contend that CD 35 is an impermissible racial gerrymander, and that the State impermissibly discriminated against minority voters in the way that minorities in Travis County and former CD 25 have been treated in the enacted map. In the D.C. Court, the Gonzalez Intervenors assert that benchmark CD 25 was a protected crossover district, and thus its presence must be factored into the retrogressive effects analysis.

Even though the Supreme Court has recognized the benefits of crossover districts in achieving the goals of the VRA, § 2 does not mandate preserving crossover districts. *Bartlett v. Strickland,* 556 U.S. 1, 23, 129 S.Ct. 1231, 173 L.Ed.2d 173

---

18 so as unnecessarily to replace core minority areas with areas slated for Anglo population growth and thereby diminish minority voting strength" and removed "economic generators from each Black congress member's district so as to reduce the voters' influence, and remove[d] from each the district

office that provides services for minority voters."

**89.** Lloyd Doggett does not represent a majority minority district.

**90.** Docket no. 630 at 15.

(2009). Further, even if the D.C. Court concludes that benchmark CD 25 was a protected crossover district under § 5, CD 35 includes the bulk of the Travis County minority Hispanic population from CD 25, and its creation potentially offsets the loss of CD 25 for Hispanics so long as it is an appropriate § 2 district and an ability district for purposes of § 5.

The Latino Task Force contends that CD 35 is a new Latino opportunity district for purposes of § 2 and a Latino ability district for purposes of § 5. The Latino Task Force argues that the creation of an additional Latino opportunity district was required by § 2 (because 7 Latino opportunity districts are required for South/Central/West Texas), and that CD 35 is an appropriate § 2 district because it satisfies all *Gingles* criteria.[91]

■ Whether CD 35 crosses the line from a permissible § 2 district to an impermissible racial gerrymander is a close call. A racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect, even if the reason for the racial classification is benign or remedial. *Shaw v. Hunt,* 517 U.S. 899, 904–05, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). As explained by the Supreme Court,

> [T]hose who claim that a legislature has improperly used race as a criterion, in order, for example, to create a majority-minority district, must show at a minimum that the "legislature subordinated traditional race-neutral districting principles ... to racial considerations." Race must not simply have been "a motivation for the drawing of a majority-minority district," but "the 'predominant factor' motivating the legislature's

districting decision." Plaintiffs must show that a facially neutral law is " 'unexplainable on grounds other than race.' "

The Court also has made clear that the underlying districting decision is one that ordinarily falls within a legislature's sphere of competence. Hence, the legislature "must have discretion to exercise the political judgment necessary to balance competing interests," and courts must "exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race."

*Easley v. Cromartie,* 532 U.S. 234, 241–42, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (citations omitted) (emphasis in original). Thus, to trigger strict scrutiny, Plaintiffs must show that race was the "predominant" consideration in drawing the district lines such that the Legislature subordinated traditional race-neutral districting principles to racial considerations. *Bush v. Vera,* 517 U.S. 952, 959, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (plurality opinion).

■ The State argued to the D.C. Court in its motion for summary judgment that CD 35 is a minority opportunity district.[92] Further, Ryan Downton, the lead person in drawing the original congressional plan (C125), testified that he purposefully drew CD 35 as a Hispanic majority district. Tr. 916.[93] Downton further testified that he took the "idea" of CD 35 "from the map that MALDEF submitted to us," which "was trying to create a Hispanic majority district in central Texas." Tr. 916; *see also* Tr. 918 ("When we drew the map originally, we were focused on getting District 35 above 50 percent of HCVAP."); Tr. 989 ("we were trying to create a His-

---

**91.** Docket no. 638 at 36.

**92.** D.C. docket no. 41.

**93.** "Q: And was it your understanding that one of the objectives of the legislature was to try to create a new citizen voting age population majority district for Hispanics in Texas? A: Yes. I was directed to do that."

panic majority district"). This testimony establishes that a primary goal [94] in drawing CD 35 was the creation of a Hispanic majority district. However, intentional creation of a majority minority district is insufficient, standing alone, to trigger strict scrutiny. *Vera,* 517 U.S. at 958–59, 116 S.Ct. 1941.

The State argues that non-racial factors also shaped CD 35, including placing the district where the population growth occurred and partisan politics (particularly, targeting Congressman Lloyd Doggett). Thus, this appears to be a "mixed motive" case as described by a plurality of the Court in *Bush v. Vera,* 517 U.S. at 959, 116 S.Ct. 1941.

In a mixed motive case, determining when traditional districting criteria have become subordinated to race is highly fact specific and difficult. For example, although CD 35 in the enacted plan joins populations in Travis County and Bexar County over 80 miles apart, the benchmark plan divides Travis County among three congressional districts, joining portions of Travis County with Bexar County in CD 21 and portions of Austin/Travis County with Houston/Harris County in CD 10 that are even farther apart. Congressman Lloyd Doggett and Travis County Democrats appear to have been targeted by the Republican-controlled Legislature, with the result being further division of Austin and Travis County into five congressional districts to ensure that Democratic voters are contained in majority-Republican districts.[95]

█ Though CD 35 is not particularly compact, the VRA does not require compact districts. Nor is it as noncompact or bizarrely shaped as other districts the Supreme Court has found to be unconstitutional. Nevertheless, the Supreme Court has stated that bizarre shape is not required to invoke strict scrutiny. *Miller v. Johnson,* 515 U.S. 900, 912, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Our observation in Shaw of the consequences of racial stereotyping was not meant to suggest that a district must be bizarre on its face before there is a constitutional violation."). However, "where the district is not so bizarre on its face that it discloses a racial design, the proof will be more 'difficul[t].'" *Id.* at 914, 115 S.Ct. 2475.

In *Bush v. Vera,* racial criteria had a qualitatively greater influence on the drawing of district lines than race-neutral criteria, 517 U.S. at 969, 116 S.Ct. 1941, and race predominated over other districting criteria in determining the district's boundaries, *id.* at 970–71, 116 S.Ct. 1941. Specific portions of boundary lines in districts found unconstitutional have been "tailored perfectly to maximize minority population," *id.* at 971, 116 S.Ct. 1941, whereas Plaintiffs in this case have not convinced the Court at this stage that district lines in CD 35 were manipulated to such an extreme degree.

In their briefing, some Plaintiffs complain that CD 35 has 100 precinct cuts, but they point to only two specific precinct cuts in Travis County where racial considerations appear to have controlled. David Butts testified about (1) the splitting of

---

94. The evidence establishes that Downton was responsible for the original configuration of CD 35 and for the subsequent changes that were made to it. As the actual mapdrawer, Downton's state of mind and decisionmaking appears to be the most relevant evidence concerning the extent to which race played a role in determining district lines.

95. For example, an email sent from Eric Opiela to Rep. Lamar Smith and Gerardo Interiano on December 17, 2010 contained an apparent online discussion of a demonstration map, the "centerpiece" of which was "the 8-way split of Austin" such that Doggett "runs in a 58 percent McCain district no matter what." Docket no. 323 (part 2) at 24.

precinct 433 to divide St. Edward's University to place the dorms (with large Hispanic student population) in CD 35 [96] and the administration building in CD 21; and (2) and the splitting of precinct 440 to include an arrowhead shape containing the Riverside apartments within CD 35. Tr. 1199.

Mr. Butts further noted that in the northern part of CD 35 "they split through [precinct] 141, which is heavily minority, which is—let's see, 141 right there to go to here and go up into this area right here which is heavily Hispanic and black. Now, the interesting thing is that 140 is heavily Hispanic also. Not as heavy as this precinct, but they didn't reach up and grab that one. I'm not sure why, but they didn't." Tr. 1195. And he testified that "you have Hispanics also going into Congressional District 10." *Id.* Thus, this testimony indicates that Hispanics were both included and excluded from CD 35. Butts further testified that the "squiggle" at the northern part of CD 35 is a substantial Hispanic population, Tr. 1196, which corresponds with Downton's testimony that the "squiggle" was included to increase Hispanic population.[97] However, racial shading exhibits demonstrate that the "squiggle" both includes and excludes areas with substantial Hispanic population. Thus, Plaintiffs' assertion that the Legislature "went to extreme lengths to gather in Hispanic population" is not fully supported by the evidence.

In addition, part of CD 35's unusual shape is the 50–mile long, 3–mile wide corridor running along I–35 that joins Travis and Bexar Counties. However, the evidence indicates that CD 35 was originally much wider along this portion, and the narrowing was the result of a request by State Representative Kuempel (R), who lives in Guadalupe County and asked that the mapdrawers keep as much of Guadalupe County whole as possible. Downton testified that he put Guadalupe County in CD 15 to accommodate this request. Though Guadalupe County was not in fact kept whole, the Court is unaware of any evidence explaining why a small, predominantly Anglo portion of Guadalupe County was kept in CD 35, and thus cannot determine whether there was a racial or nonracial reason.[98]

■ Thus, the Court is unable to conclude at this time that Plaintiffs have shown "intensive and pervasive use of race" or that the district's shape "was essentially dictated by racial considerations." *Vera,* 517 U.S. at 972–73, 116 S.Ct. 1941. Accordingly, the Court does not find that Plaintiffs are likely to succeed on their claim that CD 35 is subject to strict scrutiny. Nor have Plaintiffs demonstrated a substantial likelihood that CD 35 would fail a strict scrutiny analysis if strict scrutiny applies.

The Court is unable to conclude that Plaintiffs have made the necessary showing on the claims relating to the disman-

---

96. Tr. 1197–98. *See Fairley v. Hattiesburg, Miss.,* 584 F.3d 660, 670 (5th Cir.2009) (noting that "it is obviously questionable whether splitting members of geographically contiguous communities in interest, *i.e.,* the colleges, into separate constituencies would have been legally satisfactory" and "[a]ny plan that split USM into multiple wards, furthermore, would be highly suspect on its face").

97. Tr. 989 ("If that is a Hispanic area, and I think it is likely that it is, then, yes, it would

have been included in District 35 as we were trying to create a Hispanic majority district.").

98. According to statistics provided by the Texas Legislative Council (Report Red–100), 17% of the population of Guadalupe County is in CD 35 and 83% is in CD 15. The portion of CD 35 that reaches into southern Guadalupe County picks up 22,845 people, including 5,844 Hispanics.

tling of CD 25. As a legal matter the Supreme Court has recognized that if "a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009). As a factual matter, however, the Court cannot conclude at this time that the dismantling of CD 25 was motivated by a discriminatory purpose as opposed to partisan politics.

The Court recognizes the complaints of African–American voters that their voting ability is retrogressed in the enacted map by the loss of benchmark CD 25, which they assert is a functioning crossover district.[99] However, serious and difficult questions remain to be decided in the D.C. Court regarding whether (1) African–American voters, in coalescing with other voters, had an ability to elect the candidate of their choice in benchmark CD 25,[100] (2) assuming that they did, whether such abili-

ty would be protected under § 5, and (3) assuming it would, whether there was in fact retrogression in the enacted map.[101] The Court is unable to predetermine how the D.C. Court may ultimately resolve these difficult issues. In the interim, however, C235 makes changes to DFW that potentially offset the loss of African American voting strength in CD 25. Thus, the Court concludes that the substantial changes to the enacted map that would be required by attempting to preserve benchmark CD 25 are not justified at this time. For purposes of an interim plan, the Court concludes that C235 adequately addresses the claims relating to the Central Texas districts.

## G. CD 27/Nueces County/opportunity districts in South/West Texas

C235 also sufficiently addresses Plaintiffs' claims related to the number of opportunity districts in South/West Texas. Plaintiffs challenge enacted CDs 27 and 34, arguing that the State's decision to move

99. The State previously characterized CD 25 as a crossover district. Docket no. 457 at 19 ("CD 25 is a crossover district") and n. 9 (defining a crossover district as "a district in which African–Americans or Latinos make up less than 50% of voters but can usually elect their candidates of choice with reliable crossover voting by members of the Anglo majority"). However, the State now contends that benchmark CD 25 was not a crossover district.

100. The Intervenors' experts have opined that CD 25 should be counted as a minority ability district because it is a district in which minority voters have the ability to elect candidates of their choice to Congress. Rebuttal Report of S. Ansolabehere at 5, 15 (D.C. docket no. 155; D.C. Trial Exh. 724)(CD 25 is a district in which minorities have the ability to elect their preferred candidates and it must be included in an analysis of retrogression); Supp. Expert Report of A. Lichtman at 6, ¶ 10 (D.C. docket no. 152 and D.C. Trial Exh. 372)("There is an additional district in C100 that should also be counted as a district that

provides minority voters the ability to elect candidates of their choice to Congress. That is Congressional District 25, in Travis County.").

101. See Rebuttal Report of S. Ansolabehere at 6, D.C. docket no. 155; D.C. Trial Exh. 724("Plan C185 dismantles CD 25. The result of this dismantling and changes in other district boundaries is to reduce the number of Congressional Districts in which Blacks and Hispanics have the ability to elect their preferred candidates from 11 to 10."). *See* also Supp. Expert Report of A. Lichtman at 9–11 (D.C. docket no. 152; D.C. Trial Exh. 722) ("The new districts comprising fragments of Travis County are all dominated by Anglo Republicans, in which minorities have no ability to elect candidates of their choice. There is no substitute crossover district in the state-passed plan for the dismembered existing CD 25. Thus, the state-passed proposed plan has the effect of retrogressing minority voter opportunities by reducing minority ability to elect districts from 11 of 32 to 10 of 36.").

Nueces County from a Latino opportunity district (benchmark CD 27) to a largely Anglo district (enacted CD 27) [102] violates both the Fourteenth Amendment and § 2 by depriving the large Latino population in Nueces County of the ability to elect the candidate of their choice and by "cracking" Latinos such that a new Latino opportunity district cannot be drawn in the South and West Texas area.

Plaintiffs argue that Nueces County has historically been part of the South Texas configuration,[103] and that separating the large Hispanic population from South Texas was part of an intentional scheme to diminish the total Hispanic population available for creating minority opportunity districts in South and West Texas. In this regard, some Plaintiffs showed that 7 compact districts could be drawn that included Hispanic Nueces County voters but not Travis County voters,[104] and thus they argue that the Legislature intentionally excluded Nueces County Hispanics as part of its scheme to unnecessarily destroy the CD 25 "tri-ethnic coalition" district. Other Plaintiffs, such as the Latino Redistricting Task Force, argue that the State could have included the Nueces County Hispanics in the South Texas configuration even with the State's enacted version of CD 35. *See* Plan C190. And yet other Plaintiffs contend that, by including Nueces County within South Texas, it is possible to draw 8 (as opposed to 7) Latino opportunity districts in South/Central/West Texas. *See* Plans C188, C211. Thus, Plaintiffs contend, the State's decision to divest Nueces County from South Texas, which had "ripple

effects" not only in South/West/Central Texas but also around Harris County, was a violation of § 2 and an act of intentional discrimination against Hispanics.

■ Although these claims are not without merit, based on the analysis conducted thus far, the Court does not find at this time that Plaintiffs have a likelihood of success on the merits of their claim sufficient to warrant changes to the enacted map for an interim plan.

With regard to the claims that § 2 requires 8 Latino opportunity districts in South/Central/West Texas, the hypothetical plans proposed in support of this assertion fail to satisfy *Gingles* in terms of compactness. In Plans C188 and C211, a proposed district stretches from south Hidalgo County all the way to north Travis County. The Supreme Court has ruled that a nearly identical (and arguably more compact) district in the same location was "noncompact for § 2 purposes." *LULAC*, 548 U.S. at 435, 126 S.Ct. 2594. Thus, Plaintiffs do not have a likelihood of success on their § 2 claims premised on the failure to create 8 Latino opportunity districts in South/Central/West Texas.

As noted, several Plaintiffs contend that 7 opportunity districts could have been created that included the Hispanic voters of Nueces County. C235 sufficiently addresses those § 2 claims by restoring CD 23, and thus including 7 Latino opportunity districts in South/Central/West Texas.

Although C235 leaves Nueces County (and thus approximately 200,000 Hispanics

**102.** Benchmark CD 27 was renumbered as CD 34 in the State's enacted plan. The State then inserted a new Congressional District along the central Gulf Coast and numbered it CD 27.

**103.** The Court notes that from 1968 to 1980, Nueces County was part of a central Gulf Coast district spanning northeast up to and

including either Matagorda or Brazoria County. Nueces County first became part of South Texas CD 27 in 1982, where it has remained since that time (though for the 2002 election, the western portion of the county was placed into CD 15).

**104.** *See* Plans C123, C163, C164, C201, C208, C214, C218.

who previously were in a Latino opportunity district) in the new Anglo district to the North, the Court finds no basis for altering the enacted map's placement of Nueces County. Even though the Supreme Court has indicated that § 2 rights are individual rights,[105] the *Shaw* Court noted that "[t]his does not mean that a § 2 plaintiff has the right to be placed in a majority-minority district once a violation of the statute is shown. States retain broad discretion in drawing districts to comply with the mandate of § 2." *Shaw*, 517 U.S. at 917 n. 9, 116 S.Ct. 1894 (citing *Voinovich v. Quilter*, 507 U.S. 146, 156–157, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993); *Growe v. Emison*, 507 U.S. 25, 32–37, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993)). The *Shaw* Court further indicated that, even under a strict scrutiny standard, the Legislature need only "substantially address" the § 2 violation. *Shaw*, 517 U.S. at 918, 116 S.Ct. 1894; *see also Bush v. Vera*, 517 U.S. 952, 994, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring) ("[I]f a State pursues that compelling interest by creating a district that 'substantially addresses' the potential liability, and does not deviate substantially from a hypothetical court-drawn § 2 district for predominantly racial reasons, its districting plan will be deemed narrowly tailored."). *Cf. Bartlett v. Strickland*, 556 U.S. 1, 23, 129 S.Ct. 1231, 173 L.Ed.2d 173 (2009) ("Much like § 5, § 2

allows States to choose their own method of complying with the Voting Rights Act....").

■ Although Plaintiffs contend (and demonstrate) that Nueces County Hispanics could have been included in a South Texas district along with other voters suffering a § 2 violation, they have not established a substantial likelihood of success on their claim that the failure to so place them was a violation of § 2 or the Fourteenth Amendment. The failure to place Nueces County Hispanics in a South Texas district has not diminished Hispanic voter opportunity for § 2 purposes, since whether they are included or not, it appears that only 7 reasonably compact Latino opportunity districts can be drawn in compliance with § 2. In other words, Plaintiffs fail to demonstrate that their placement prevented them (or other Latinos) from constituting a majority in an additional district. *See Voinovich*, 507 U.S. at 154, 113 S.Ct. 1149; *see also id.* at 155, 113 S.Ct. 1149 ("§ 2 focuses exclusively on the consequences of apportionment"). With the restoration of CD 23, C235 substantially addresses the § 2 violation while respecting the Legislature's policy decisions concerning the placement of Nueces County. Plaintiffs produce no authority to show that every Hispanic voter who was shown to be within a hypothetical or potential *Gingles* district must be placed into an opportunity district.[106] Because C235 cre-

---

105. In *Shaw v. Hunt*, 517 U.S. 899, 917, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996), the Supreme Court held that § 2 is an individual right as opposed to a right of a minority group as a whole. Thus, in *Shaw* and *LULAC*, it recognized that the State's creation of an opportunity district for those without a § 2 right offers no excuse for its failure to provide an opportunity district for those with a § 2 right. *Id.; LULAC v. Perry*, 548 U.S. 399, 430, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006).

106. *LULAC v. Perry* states that while States retain broad discretion in drawing districts to comply with § 2, "[t]he Court has rejected the premise that a State can always make up for

the less-than-equal opportunity of some individuals by providing greater opportunity to others ..., [and] these conflicting concerns are resolved by allowing the State to use one majority-minority district to compensate for the absence of another only when the racial group in each area had a § 2 right and both could not be accommodated." 548 U.S. 399, 429, 126 S.Ct. 2594, 165 L.Ed.2d 609 (2006). However, *LULAC* did not involve a situation wherein a State created the required number of minority opportunity districts but failed to include all the voters who demonstrated a § 2 violation within those districts. And, although § 2 may confer individual rights, "plaintiffs can prevail on a dilution claim only

ates the required number of § 2 districts and substantially addresses the alleged § 2 violation, Plaintiffs have demonstrated no basis for further changes related to Nueces County.

Nor is the Court able to conclude that Plaintiffs have established a substantial likelihood of success on their claim that the Legislature's decision to exclude Nueces County from a § 2 district was intentionally racially discriminatory. Downton testified that there were "dual goals with 27 and 34" to create a district controlled by Cameron County and to create a district for Congressman Farenthold, who lived in Nueces County, to be elected as a Republican. The State elicited testimony that the State House and State Senate representatives from Cameron County (all three Latino Democrats) expressed a desire for a congressional district to be anchored in Cameron County, rather than, as was the case in benchmark CD 27, a district weighted on both ends by the competing ports of Brownsville and Corpus Christi. Further, Gerardo Interiano testified that Nueces County was placed in CD 27 based on a request to be put in a district going north, or at least to be the anchor of a district. Tr. 1461.

In its motion for summary judgment in the § 5 case, Texas argued that CD 27 was overpopulated, and given its location along the Mexico border and the Gulf of Mexico, there were limited options for dealing with the overpopulation.[107] Texas asserted that "Nueces County, in the northern part of [CD 27], was moved into a district to the north, where the Legislature was able to keep the county contained in a single district." Although that placement may have had a disadvantageous effect on Hispanic populations in other areas (such as Travis County and/or the Houston area), and even if the Legislature was aware of such a disadvantageous effect, Plaintiffs have not demonstrated a likelihood of success on their claim that a racially discriminatory purpose lay behind the decision.

## H. Remaining § 2 claims

The Court concludes that C235 adequately addresses Plaintiffs' § 2 claims. To the extent Plaintiffs argue that § 2 requires 7 Latino opportunity districts in South/Central/West Texas, C235 creates them in response to the § 5 claims, and thus this Court need not decide whether § 2 requires 7 Latino opportunity districts. To the extent Plaintiffs base their § 2 claims on the creation of coalition districts, the Court finds that significant legal and factual issues remain unresolved that preclude a finding at this time that Plaintiffs are likely to succeed on the merits of these claims.

### Conclusion

The Court has independently reviewed C235 and determined that it complies with the Supreme Court's standards set forth in *Perry v. Perez* and that it is an appropriate interim plan. For the reasons we have explained, we have adopted Plan C235.

---

if they show that, under the totality of circumstances, the State's apportionment scheme has the effect of diminishing or abridging the voting strength of the protected class," as opposed to individuals within the class. *Voinovich*, 507 U.S. at 157, 113 S.Ct. 1149.

**107.** D.C. docket no. 41 at 28.